UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

OVADIA AVRAHAM,

               Plaintiff,

        -v-                           5:15-CV-1297

LAKESHORE YACHT & COUNTRY CLUB,
INC., and its members / owners, TOWN OF
CICERO NY, NEW YORK STATE, JUDY
BOYKE, ANTHONY RIVIZZIGNO, WAYNE
DEAN, STEVEN PROCOPIO, Town of Cicero
Code Enforcement, RICHARD HOOPER,
Town of Cicero Code Enforcement, JESSICA
ZAMBRANO, Town of Cicero, ZACHARY M.
MATTISON, Hancock Estabrook, LLP,
MICHAEL L. CORP, Hancock Estabrook, LLP,
JOHN J. MARZOCCHI, Germain and Germain
Law Firm, NEIL G. GERMAIN, Germain and
Germain Law Firm, ROBERT M. GERMAIN,
Germain and Germain Law Firm, VERN
CONWAY, ROBERT SMITH, Town of Cicero
Planning Board, MARK VENESKY, Town of
Cicero Board, RICHARD CUSHMAN, Town of
Cicero Board, GILBERT, STINZIANO, HEINZ
& SMITH P.C., HANCOCK ESTABROOK LLP,
GERMAIN AND GERMAIN LAW FIRM, HAL
R. ROMANS, Ianuzi & Romans Land Surveying,
P.C., and IANUZI & ROMANS LAND
SURVEYING, P.C.,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                        OF COUNSEL:

OVADIA AVRAHAM
Plaintiff, Pro Se
6724 Lakeshore Road
Cicero, NY 13039

NEWMAN & LICKSTEIN
Attorneys for Defendant Lakeshore
 Yacht & Country Club Inc.

SCOTT A. LICKSTEIN, ESQ.
STEVEN D. LICKSTEIN, ESQ.

SUGARMAN LAW FIRM LLP
Attorneys for Defendants Town of Cicero NY,
 Judy Boyke, Anthony Rivizzigno, Wayne
 Dean, Steven Procopio, Richard Hooper,
 Jessica Zambrano, John J. Marzocchi,
 Neil G. Germain, Robert M. Germain,
 Vern Conway, Robert Smith, Mark Venesky,
 Richard Cushman, Gilbert, Stinziano, and
 Heinz & Smith P.C.
211 West Jefferson Street
Syracuse, NY 13202

PAUL V. MULLIN, ESQ.

HON. ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
Attorneys for Defendant New York State
The Capitol
120 Broadway
Albany, NY 12224

ADRIENNE J. KERWIN, ESQ.
Ass't Attorney General

GILBERTI, STINZIANO LAW FIRM
Attorneys for Defendant Anthony P.
 Rivizzigno, Gilberti, Stinziano, and
 Heinz & Smith P.C.
555 East Genesee Street
Syracuse, NY 13202

ANTHONY P. RIVIZZIGNO, ESQ.

HANCOCK, ESTABROOK LAW FIRM
Attorneys for Defendant Zachary M. Mattison,
 Michael L. Corp, and Hancock Estabrook LLP
100 Madison Street, Suite 1500
Syracuse, NY 13202

JANET D. CALLAHAN, ESQ.

COSTELLO, COONEY LAW FIRM
Attorneys for Defendants Gilberti, Stinziano,
 and Heinz & Smith P.C.
500 Plum Street, Suite 300
Syracuse, NY 13204

PAUL G. FERRARA, ESQ.

SMITH, SOVIK, KENDRICK & SUGNET, P.C.     KEVIN E. HULSLANDER, ESQ.
Attorneys for Defendant Germain and Germain
    Law Firm
250 South Clinton Street, Suite 600
Syracuse, NY 13202

PAPPAS, COX, KIMPEL, DODD & LEVIN, PC     THOMAS J. MURPHY, ESQ.
Attorneys for Defendants Hal R. Romans and
    Ianuzi & Romans Land Surveying, P.C.
614 James Street, Suite 100
Syracuse, NY 13203

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

On October 30, 2015, plaintiff Ovadia Avraham ("Avraham" or "plaintiff"), proceeding

pro se, filed this civil rights action alleging that defendants are participants in a decades-long

conspiracy whose primary object has been to prevent plaintiff from developing a parcel of

waterfront land situated adjacent to the Lakeshore Yacht and Country Club (the "LYCC" or

the "Club") in Cicero, New York.

Avraham's initial seventy-six page complaint, which included eighteen pages of

supporting exhibits and asserted twenty-one causes of action against twenty-three different

defendants, sought injunctive relief as well as millions of dollars in compensatory and

punitive damages.  The same day he instituted this lawsuit, plaintiff also filed two requests to

"Remove/Transfer" certain pending state court actions in which he is, or was, a named

defendant in an effort to consolidate those state actions as part of this federal one.  A few

days later, plaintiff filed two emergency motions seeking preliminary injunctive relief.

On November 9, 2015, a Decision and Order issued denying all four of Avraham's pending motions. Among other things, this Decision and Order concluded that plaintiff's removal petitions were procedurally defective and that his requests for injunctive relief lacked the requisite supporting documentation.

On November 24, 2015, defendant Hal Romans ("Romans") and his surveying firm, Ianuzi & Romans Land Surveying, P.C. (the "Surveying Firm Defendants"), submitted an answer to Avraham's complaint. However, in lieu of filing similarly responsive pleadings, the twenty-one other named defendants chose instead to invoke the Federal Rules of Civil Procedure to seek pre-answer dismissal of this action insofar as plaintiff's complaint could be construed as raising one or more claims against them.

First, on December 31, 2015, defendant New York State (the "State") moved pursuant to Rules 12(b)(1) and 12(b)(6) seeking dismissal from the action on the ground that the Eleventh Amendment precludes Avraham from asserting any viable claims against it.

Second, on January 5, 2016, defendant Gilberti, Stinziano, Heintz & Smith, P.C. (the "Gilberti Firm"); defendants Town of Cicero (the "Town"), Judy Boyke ("Boyke"), Anthony P. Rivizzigno ("Rivizzigno"), Wayne Dean ("Dean"), Steven Procopio ("Procopio"), Richard Hooper ("Hooper"), Jessica Zambrano ("Zambrano"), John J. Marzocchi ("Marzocchi"), Neil G. Germain ("N. Germain"), Robert M. Germain ("R. Germain"), Vern Conway ("Conway"), Robert Smith ("Smith"), Mark Venesky ("Venesky"), and Richard Cushman ("Cushman") (collectively the "Town Defendants"); and defendants Hancock Estabrook, LLC (the "Hancock Firm") along with two of its attorneys, Michael L. Corp ("Corp") and Zachary M. Mattison ("Mattison"), (collectively the "Hancock Firm Defendants"), each moved separately

- 4 -

seeking Rule 12(b)(6) dismissal. Defendants Germain & Germain, LLP (the "Germain Firm") filed a substantially similar Rule 12(b)(6) motion on February 5, 2016.

On February 10, 2016, Avraham filed a motion seeking an entry of default against the LYCC, which had not yet entered an appearance. The Club responded to plaintiff's filing in short order, explaining in a February 19 letter that it had not been properly served and requesting an extension of time to answer or otherwise respond to plaintiff's complaint. The Club's request was granted on February 22.

On February 25, 2016, faced with the prospect of an imminent dismissal motion from the LYCC as well as already-filed dismissal motions from the State, the Gilberti Firm, the Germain Firm, the Town Defendants, and the Hancock Firm Defendants, Avraham requested a ninety-day extension of time to respond. The Club filed its own Rule 12(b)(6) dismissal motion on February 29 and, on March 17, plaintiff's request for an extension of time to respond was granted.

On April 21, 2016, Avraham moved to amend his complaint, submitting a fifty-six page proposed amended pleading along with seven short exhibits. Although the Surveying Firm Defendants submitted a letter motion indicating that they did not oppose plaintiff's motion for leave to amend, the LYCC, the Gilberti Firm, the Germain Firm, the Town Defendants, and the Hancock Firm Defendants (collectively "defendants") each submitted briefing in opposition to plaintiff's request for leave to amend.[1]

Finally, on May 17, 2016, Avraham further supported his request for leave to amend with a sixty-eight page affirmation that describes in greater detail the allegedly unlawful

---

[1] The State did not submit further briefing.

conduct on which his proposed amended complaint is based.  Since filing this particular

motion to amend, plaintiff has also filed (1) a letter motion requesting leave to file another

amended complaint and, more recently, (2) a second motion to amend accompanied by a

second proposed amended complaint.

In addition to the fact that both of these requests are premature in light of Avraham's

already pending motion to amend under consideration here, plaintiff's newly proposed

pleading includes substantially the same factual allegations and claims for relief that will

already be addressed in this decision.  However, because he is proceeding pro se, the

additional factual information in plaintiff's affirmation as well as his second proposed pleading

will be considered to the extent these documents clarify or supplement the allegations in

plaintiff's original amended pleading.

All of these pending motions will now be considered on the basis of the presently

available submissions and without oral argument.

## II.  <u>BACKGROUND</u>[2]

Avraham, an ethnic Jew born in Israel, immigrated to the United States in

1974.  Proposed Am. Compl. ("Compl.") at 1, 7.[3]  In 1995, plaintiff purchased an eighty-two

acre parcel of waterfront property (the "Property") located on Oneida Lake from former New

---

[2]  At first blush, Avraham's affirmation appears to be yet another formulation of a possible amended complaint.  However, upon further review, this document appears to explain in greater detail, rather than fully supplant, the narrative thread running through plaintiff's proposed amended pleading.  Accordingly, the following allegations are taken from the proposed amended complaint, ECF No. 49-1, the supporting affirmation, ECF No. 61-1, and a review of the second proposed pleading, ECF No. 64-1, and will be assumed true for purposes of resolving the pending motions.  However, for reasons that will be made clear below, the additional factual detail provided in the affirmation and the second proposed amended complaint that concern events prior to October of 2011 will be omitted.

[3]  The individually numbered paragraphs in Avraham's proposed amended complaint repeat themselves at various junctures.  Accordingly, specific citations are to the page numbers assigned to the document by CM/ECF.

York State Senator Tarky Lombardi, Jr.  Id. at 1-2, 11.  The Property, which includes the Oneida Bay Marina (the "Marina"), is situated adjacent to the LYCC, itself located at 6777 Lakeshore Road in Cicero, New York.  Id. at 4-5, 11.

Lombardi, a former member of the LYCC, chose to sell the Property to Avraham for only $10,000 more than what John Wozniczka, Sr., himself a long-time Club member, had offered for the entire parcel.  Id. at 1, 19.  According to plaintiff, this infuriated the rest of the Club members.  Id.  Plaintiff alleges that Club members immediately offered to purchase the Property from him.  Id.  When plaintiff refused this offer, the Club members "made it their objective to do 'whatever it takes'" to "make sure [plaintiff is] never allowed to do anything" with the Property.  Id. at 11-12.

On March 15, 1996, Avraham received a telephone call from Anthony Aloi, who advised plaintiff that he wanted to discuss plaintiff's "parking lot and the illegal dumping in which the LYCC had engaged in" on plaintiff's Property.  Compl. at 12.

On March 23, 1996, Avraham received another telephone call, this time "from a man with a deep NYC accent who introduced himself as 'Anthony,' [who] said he is a member of the LYCC."  Compl. at 12.  According to plaintiff, "Anthony" informed him that the Club members were "not very happy" that he had purchased the land.  Id.  Plaintiff asserts that "Anthony" told him "you don't know who you are messing with" and that he should do everyone a favor and "go back where [he] came from."  Id.

On April 19, 1996, Aloi visited Avraham at the Marina and warned him that the LYCC "has never lost a case."  Compl. at 12.  Although plaintiff explained that he believed he had certain legal rights to use a nearby parking lot, Aloi refused to discuss the illegal dumping on plaintiff's Property or how to remedy the situation.  Id.  According to plaintiff, Aloi also made

certain statements at this meeting that suggested the Club members would begin to take action to obstruct plaintiff's attempts to make use of the Marina or the associated parcel of land.  Id.  Plaintiff also asserts that Aloi suggested to plaintiff that he should sign an agreement to lease the parking lot from LYCC.  Id.  When he refused, Aloi told plaintiff that he "should not mess" with the Club because "they don't like [his] kind over here."  Id.

On April 30, 1996, Nini Segroy stopped at Avraham's Marina and introduced himself as a member of the LYCC.  Compl. at 12.  According to plaintiff, Segroy warned him that "he should cooperate and sign a lease for the parking lot" and also told plaintiff that he "should not mess with the LYCC."  Id.

On May 10, 1996, John P. Wozniczka, Jr. drove past Avraham in the parking lot and yelled:  "You fucking Jew go back where you came from."  Compl. at 12.

On May 22, 1996, a man who introduced himself to Avraham as "Nick" stopped at the Marina and again warned plaintiff that the Club members were "not happy" that plaintiff was the new owner of the Property.  Compl. at 12-13.

On May 24, 1996, Patrick Mastroiano drove past Avraham's Property and yelled:  "Sand nigger, get the fuck out of here."  Compl. at 13.

On June 8, 1996, "Nick" returned to Avraham's Property and warned him again that Club members would make his life "miserable" if he did not cooperate with them.  Compl. at 13.

On June 17, 1996, Avraham was "hosting a visit" from his cousin, Jimi Avraham, from England.  Compl. at 13.  According to plaintiff, unidentified Club members yelled to Jimi:  "Just what we need, more towel heads" as they "came past" plaintiff's Property.  Id.  Plaintiff was forced to physically restrain Jimi, who wanted to "physically

defend himself" from these individuals.  Id.

In July of 1996, Avraham became involved in a legal dispute with the Caster family, his neighbors to the west.  Compl. at 42.  According to plaintiff, his "attorney wrote to the Casters asking them to move all of their belongings and to stay off [the] property."  Id.

On July 19, 1996, Avraham received a letter from the Department of Health that permitted him to operate a "hot dog stand" on the Property.  Compl. at 13.  The next day, however, Jay Seitz stopped by plaintiff's Property and told him "there were many complaints" about the stand.  Id.  Six days later, on July 26, 1996, Seitz again stopped by plaintiff's Property and told him that it was "illegal" for him to operate the hot dog stand.  Id.  According to plaintiff, Seitz also "threatened legal action."  Id.

On July 29, 1996, Avraham met with Vern Conway, Chairman of the Town of Cicero's Zoning Board of Appeals.  Compl. at 8-9, 13.  According to plaintiff, Conway informed him that "as long as the LYCC is against [plaintiff]" he will "not be able to do anything" with his Property.  Id.

In August of 1996, the Caster family filed a "motion to show cause" against Avraham in Supreme Court, Oswego County.  Compl. at 42.  An Order entered by that Court "temporarily barred" plaintiff from the Property.  Id.  Plaintiff asserts that Anthony Rivizzigno, the Town of Cicero's Attorney, instructed officers with the Town of Cicero Police Department to enforce this Order.  Id. at 43.

On August 2, 1996, Seitz stopped at Avraham's Property "to harass him" about a "car sales sign" plaintiff had erected on the land.  Compl. at 14.  After plaintiff explained to Seitz that businesses located on the Property "had operated as a car and boat sales office and show room for more than forty years," he "never heard from him again on this matter."  Id.

On August 10, 1996, Seitz returned to Avraham's Property accompanied by "a man named Mark," a Town of Cicero Councilman.  Compl. at 14.  According to plaintiff, both Seitz and "Mark" attempted to convince him "not to operate a hot dog stand from his property" because there were "too many" complaints.  Id.  Seitz and "Mark" explained that Rivizzigno had asked them to speak to plaintiff because he had been receiving complaints.  Id.  Later that day, "two people in a golf cart parked at the parking lot and [ ] talked loudly to each other" about how they were going to shut plaintiff down.  Id.  Two weeks later, Seitz told plaintiff he would be "dragged into court" about the hot dog stand.  Id.  The same day he received this information from Seitz, Patrick Mastroiano, the LYCC President, drove past plaintiff and yelled:  "Hey, why don't you go back where you came from, sand nigger."  Id.

On August 30, 1996, John P. Wozniczka, Sr. drove past Avraham in a "brown Cadillac" and yelled:  "Hey towel head, go home."  Compl. at 14.  Plaintiff alleges that a number of other, unidentified people yelled similar "vulgar and foul" names at him during the summer of 1996.  Id.  According to plaintiff, each of these people either "turned into the LYCC driveway or had just exited the LYCC driveway."  Id.

On September 13, 1996, Avraham found a "mutilated dead skunk" in his mailbox.  Compl. at 37.  Although plaintiff called the police to investigate, there was "no evidence of the perpetrator and the matter received no further attention."  Id.  Later, two different people drove by in cars headed for the LYCC and held their noses, acting "as though there was a foul smell."  Id. at 37-38.

On May 9, 1997, LYCC President Mastroiano drove past Avraham in a van and yelled:  "We are going to shut you, you fucking sand nigger."  Compl. at 14.  Five days later,

John P. Wozniczka[4] drove past plaintiff twice before yelling: "Towel head, go back to Palestine or wherever you came from." Id.

On May 30, 1997, Aloi met with Avraham to advise him that he should sign a lease for the parking lot or else the Club would "erect a fence." Compl. at 14. Plaintiff refused. Id. Later, on June 4, LYCC employees began installing a fence that blocked plaintiff's access to the parking lot. Id. at 30. According to plaintiff, Mastroiano told him to "Get the Fuck out" and that there were "no Jews allowed, [because] the Italians are here." Id. at 31. Plaintiff called 911 and requested that the New York State Police be summoned, but Captain Grant from the Cicero Police Department arrived instead. Id. at 33. Captain Grant "received his orders from Rivizzigno" and "continually" threatened plaintiff with arrest. Id.

On June 14, 1997, Avraham found a second dead skunk in his mailbox. Compl. at 38. Plaintiff again called the police, who told him that nothing could be done. Id. Six days later, Mastroiano drove by plaintiff and said: "I told you, you fucking Jew." Id. According to plaintiff, Mastroiano also "held his nose" and told him to "get the fuck out of here." Id.

On July 26, 1997, Avraham received a letter stating that the Town of Cicero had "received many complaints" about a trailer parked on his Property. Compl. at 15. According to plaintiff, he did nothing about this letter and "no further action was taken." Id.

On July 29, 1997, Conway told Avraham that his current business activities on the Property might be "illegal." Compl. at 29. Plaintiff understood this to mean that Club members would "use their official positions" within the Town to prevent him from doing

---

[4] It is unclear whether Avraham is referring to the father or the son in this particular allegation.

business if he did not "discontinue his Marina development."  Id.  Plaintiff also claims that Rivizzigno drove by him on "many occasion[s]" and yelled various ethnic slurs and other vulgarities.  Id. at 35.

On August 16, 1997, Avraham found a third dead skunk in his mailbox.  Compl. at 38.  Two weeks later, plaintiff also found a printed document in his mailbox that "advised" him "to go back where [he] came from."  Id.

On January 5, 1999, the LYCC sought a variance from the Town of Cicero to permit the Club to expand its kitchen to "compete with" plaintiff's food service operations.  Compl. at 25.  Although this request was opposed by residents, the Town of Cicero Zoning Board of Appeals unanimously granted the variance.  Id.  According to plaintiff, he had applied for, and been denied, similar variances over a four-year period.  Id.

On June 6, 1999, Avraham filed a written report with the Cicero Police Department after he was "almost run over" by a car driven by one of the Wozniczkas.  Compl. at 20.  Plaintiff claims that the Wozniczka family had constructed a new house directly behind plaintiff's property in 2001 or 2002 and would attempt to "run over" plaintiff every time they drove past him.  Id. at 34.  Plaintiff describes an incident that occurred in the "summer of 2006," when some Club members called him "that sand nigger" after he refused to turn off the "hole digging machine" he was using near the Club's golf course.  Id. at 35.  Plaintiff also describes an incident that occurred "[d]uring 2007," when Wozniczka, Jr. "walked onto" plaintiff's property and struck his daughter's dog "in the face and eye with a golf club."  Id. at 43.

On June 22, 2009, the Town of Cicero enacted an ordinance regulating hot dog vendors.  Compl. at 21.  According to plaintiff, he was the only individual selling food from a

mobile kitchen located on his own Property within the entire Town of Cicero. Id.

In August 2009, Avraham received a letter from Wayne Dean, a Town of Cicero Code Enforcement Officer, stating that a marina is not an "acceptable use" in a neighborhood commercial zone such as the one in which plaintiff's Property was situated. Compl. at 47. According to plaintiff, this zoning was changed from "commercial" in 2002 in an attempt to deny him "the proper use of his land." Id. at 6, 46.

In March of 2010, Avraham requested copies of the "Avi File" from the Town of Cicero, a file which plaintiff understood to contain "all of the documents that relate to plaintiff." Compl. at 40-41. According to plaintiff, many of the documents in this file were "never logged in or recorded." Id. at 40. It appears that Town of Cicero officials never produced this file for plaintiff. See id. at 41.

On August 25, 2010, Rivizzigno and the Town of Cicero "voted to delete and rewrite" the Town's "[P]eddler, Solicitor[, and] Food vendor ordinance." Compl. at 21. The following day, August 26, Dean informed plaintiff that anyone who works for him must "pay a fee and undergo a Police background check." Id. Later in 2010, Rivizzigno, the Gilberti Firm, Marzocchi, and the Germain Firm brought charges against plaintiff in Cicero Town Court. Id. at 47. According to plaintiff, these charges "include false imprisonment and fine for illegally selling automobiles" and for "failure to obtain" a street vendor permit. Id.

In October of 2011, Avraham received the results of a Freedom of Information Act request he had made into the complaints against him. Aff. ¶¶ 172-73. Plaintiff says this request shows there was only one, unsigned complaint against him. Id. ¶ 173. However, plaintiff also states that Dean, a Town Official, stated "under oath" that most of the complaints against plaintiff were "verbal." Id. ¶ 174.

In November of 2011, Avraham was found not guilty of the code violations alleged against him, "except the charge of sales of [an] automobile" because the presiding Judge concluded that "sales of automobiles is not allowed in a neighborhood commercial zone." Aff. ¶ 186. According to plaintiff, this is the first time the Town of Cicero has ever attempted to shut down an existing auto sales business. Id. ¶ 187.

In May 2012, Avraham began construction on "Lakeshore Estates." Compl. at 45. Although plaintiff has submitted "approved" plans and paid the required fee, he has yet to receive a building permit from the Town of Cicero. Id. at 45-46. Plaintiff submitted construction drawings to the Town of Cicero, whose officials told him it would take "about 2 weeks" to obtain the permit. Aff. ¶¶ 253-54.

On June 12, 2012, Avraham received a telephone call from the Town of Cicero Code Enforcement Office instructing him to "come in and pay for [his] building permit." Aff. ¶ 255. According to plaintiff, he paid the fee but "still did not get a permit." Id.

In February of 2014, Procopio and Richard B. Hooper, the Director of Code Enforcement for the Town of Cicero, told Avraham "that all [he has] to do is complete a simple request for an extension" and he will be granted an extension for his "foundation permit." Aff. ¶ 270.

On June 20, 2014, Avraham met with Hooper, N. Germain, Robert Smith, and Procopio, who told him that he would receive an extension within one week. Aff. ¶ 274. Plaintiff did not receive this extension. Id.

On September 10, 2014, Avraham sent Procopio and Hooper an e-mail inquiring about the reason he had not received the extension he had been promised on June 20. Aff. ¶ 275. Hooper told plaintiff that his permit had expired, he would not receive an

extension, and that he must go through the site plan approval process again.  Id. ¶ 276.

On September 12, 2014, Avraham wrote to Hooper and Jessica Zambrano, the Town of Cicero Supervisor, describing the events leading up to the denial of his permit.  Aff. ¶ 278. Plaintiff submitted "recordings" of the June 20 meeting to substantiate his claim that he was "promised" an extension, but has never heard back from Zambrano.  Id. ¶¶ 279-81.

On October 3, 2014, Avraham received a letter from Hooper.  Compl. at 45.  Although plaintiff does not describe the contents of this letter, he asserts that it was part of an effort to prevent him from "developing his real property and to reduce the value of the property to very little worth."  Id.

In December of 2014, Avraham "decided to offer food service" at his Property.  Aff. ¶ 282.

In March of 2015, Avraham met with Procopio at the Town of Cicero Code Enforcement Office and told him about his intent to offer food service.  Aff. ¶ 283.  Procopio told him that he may need a "site plan approval" or a "vendor permit."  Id. Plaintiff told Procopio that these permit requirements were inapplicable to him.  Id.

On May 7, 2015, Hooper and Procopio served Avraham with a "stop work order," demanding that plaintiff cease work "on the landscape at the center jetty."  Aff. ¶ 291. According to plaintiff, Hooper insisted that he needed a "site plan approval."  Id.  Plaintiff's architect, William Walton, told him that the "stop work order" was served on him because plaintiff had "brought in over 20 tons of stone" in violation of "town ordinance."  Id. ¶ 295.

On May 11, 2015, Avraham visited the Town of Cicero Code Enforcement Office to ask Hooper if he would give plaintiff a "sign permit" for the "Lakeside Grill."  Aff. ¶ 297. According to plaintiff, Hooper said "he would not refuse" to give him a permit.  Id.  However,

Hooper later denied the permit because plaintiff had failed to obtain a "Solicitor, Peddler, Hawker, and Street Vendor Permit." Id. ¶ 298.

In June of 2015, Avraham spoke to Joe Barbaro, a Syracuse business owner, to ask him why he did not show up for plaintiff's trial against the Caster family. Aff. ¶ 83. According to plaintiff, Barbaro told him: "I know [the LYCC] guys, they're very powerful." Id.

On June 24, 2015, the Town of Cicero enacted "Local Law 5," which changed the definition of a "restaurant" to include "all facilities" that are primarily engaged in the sale of food." Compl. at 45. According to plaintiff, this law has been "arbitrarily enforced" against him because he is "primarily" engaged "in the business of operating a marina." Id.

During the summer of 2015, Procopio, Hooper, Zambrano, Conway, Marzocchi, and the Germain Firm filed "false" complaints with the Onondaga County Health Department in an attempt to have plaintiff's health permit revoked. Compl. at 50. According to plaintiff, these complaints were based on plaintiff's failure to obtain a vendor permit from the Town of Cicero. Id.

Avraham further asserts that all of these individuals contacted his "milling materials supplier" to threaten that company with the loss of a municipal road project it had won if the supplier continued to provide plaintiff with certain materials. Compl. at 50.

Avraham also asserts that all of these individuals filed a complaint in New York State Supreme Court seeking to dismantle certain "platforms" plaintiff had built on the Property. Compl. at 51. Finally, plaintiff claims that these individuals caused the New York State Liquor Authority to revoke his liquor license. Id.

On July 18, 2015, Avraham was "served with documents containing a complaint sworn to by [Hooper]." Aff. ¶ 301. Plaintiff was later served with a "Notice of Appearance" for "town

court." Id. ¶ 302.  Plaintiff insists he is no longer affiliated with Lakeshore Estates LLC "and therefore cannot appear as defendant" in that case.  Id. ¶ 303.  Plaintiff explains that this document "alleged 8 code enforcement violations."  Id. ¶ 314.

In October 2015, Gary Repko, a retired Town of Cicero Code Enforcement Officer, told Avraham:  "they (the town) just don't like you."  Aff. ¶ 125.

On January 28, 2016, Avraham "interviewed" Alan Drohan, a law clerk to the Judge presiding over the Caster family litigation, who told plaintiff that he "prided himself" on never letting a Court Order "sit for more than 60 days."  Aff. ¶ 91.  According to plaintiff, Drohan "knows Aloi and Rivizzigno very well" and suggests that Drohan "took no action" on an Order that was supposed to have been signed in the litigation.  Id. ¶¶ 88-92.

On February 24, 2016, Kevin Atkins, a previous tenant of the Property who had become involved in the Caster family litigation, told Avraham that Aloi had "brought him a prepared affidavit and told him to sign it."  Aff. ¶ 80.

## III.  LEGAL STANDARDS

### A.  Subject Matter Jurisdiction[5]

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence."  Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005).  "In determining the existence of subject matter jurisdiction, a district court may consider evidence outside the pleadings."  Saleh v.

---

[5]  Only the State has asserted a 12(b)(1) argument.

<u>Holder</u>, 84 F. Supp. 3d 135, 137-38 (E.D.N.Y. 2014) (citing <u>Makarova</u>, 201 F.3d at 113).

"Subject matter jurisdiction is a threshold issue and, thus, when a party moves to dismiss under both Rules 12(b)(1) and 12(b)(6), the motion court must address the 12(b)(1) motion first." <u>Id</u>. (citations omitted).

### B. <u>Failure to State a Claim</u>

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" <u>Ginsburg v. City of Ithaca</u>, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). "Although a complaint need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief' (F<small>ED</small>. R. C<small>IV</small>. P. 8(A)(2)), more than mere conclusions are required." <u>Id</u>. "Indeed, '[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.'" <u>Id</u>. (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009)). "Dismissal is appropriate only where plaintiff has failed to provide some basis for the allegations that support the elements of his claims." <u>Id</u>.; <u>see also</u> <u>Twombly</u>, 550 U.S. at 570 (requiring "only enough facts to state a claim to relief that is plausible on its face").

"When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor." <u>Faiaz v. Colgate Univ.</u>, 64 F. Supp. 3d 336, 344 (N.D.N.Y. 2014) (Baxter, M.J.). In making this determination, a court generally confines itself to the "facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken." <u>Goel v. Bunge, Ltd.</u>, 820 F.3d 554, 559 (2d Cir. 2016) (quoting <u>Concord Assocs.</u>,

L.P. v. Entm't Props. Tr., 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

However, in some cases, "a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss." Goel, 820 F.3d at 559. A document is only "integral" to the complaint "where it relies heavily upon its terms and effect." Id. (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

In other words, mere notice or possession of the document is not enough; rather, the plaintiff must have relied on the terms and effect of the document in drafting the complaint. See Goel, 820 F.3d at 559; see also Nicosia v. Amazon.com, Inc., –F.3d–, 2016 WL 4473225, at *5 (2d Cir. Aug. 25, 2016) (observing that this exception is typically invoked where the unincorporated material is a "contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint").[6]

## C. **Leave to Amend**

"Generally, leave to amend should be freely given, and a *pro se* litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim." Matima v. Celli, 228 F.3d 68, 81 (2d Cir. 2000) (citations and internal quotation marks omitted); see also Foman v. Davis, 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of

---

[6]  Even then, consideration of such material is only proper if it is clear on the record that no dispute exists regarding the authenticity or accuracy of the document and that there are no material disputed issues of fact regarding the material's relevance. Nicosia, 2016 WL 4473225, at *5.

the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'").

Importantly, however, "it is well established that leave to amend a complaint need not be granted where amendment would be futile." Ellis v. Chao, 336 F.3d 114, 127 (2d Cir. 2003). "A proposed amended is futile where it 'fails to state a claim' or 'where the claim or defense proposed to be added has no colorable merit." Corbett v. Napolitano, 897 F. Supp. 2d 96, 119 (E.D.N.Y. 2012) (quoting Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc., 665 F. Supp. 2d 239, 250 (S.D.N.Y. 2009)). Accordingly, "[a]n amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002).

### D. Pro Se Pleadings

The basic pleading requirements set forth above apply to pro se plaintiffs as well as plaintiffs represented by counsel, but "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Ahlers v. Rabinowitz, 684 F.3d 53, 60 (2d Cir. 2012) (internal quotation marks omitted) (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)). In other words, "[w]here, as here, the complaint was filed pro se, it must be construed liberally with 'special solicitude' and interpreted to raise the strongest claims that it suggests." Hogan v. Fischer, 738 F.3d 509, 515 (2d Cir. 2013) (quoting Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011)).

However, "all normal rules of pleading are not absolutely suspended" when a plaintiff is proceeding pro se. Jackson v. Onondaga Cnty., 549 F. Supp. 2d 204, 214 (N.D.N.Y. 2008) (McAvoy, J.) (internal quotation marks and footnote omitted). Even a pro se plaintiff

must plead sufficient factual allegations to suggest an entitlement to relief.  See id.  Simply

put, Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation."  Iqbal, 556 U.S. at 678 (citations omitted).

## IV.  DISCUSSION

In contrast to the twenty-one causes of action set forth in his original filing, Avraham's

first proposed amended pleading identifies just five bases for recovery:  (1) the Racketeer

Influenced and Corrupt Organizations Act ("RICO"); (2) the Equal Protection Clause of the

Fourteenth Amendment; (3) the Due Process Clause of the Fourteenth Amendment;

(4) interference with plaintiff's right to contract; and (5) hate crimes in violation of New York

Penal Law.[7]

The factual allegations contained in both of Avraham's proposed amended pleadings

are substantially similar to the allegations set forth in his original complaint—these filings

chronicle in greater or lesser detail the basis for plaintiff's assertion that LYCC members and

officials with the Town of Cicero have been unlawfully meddling in his business affairs for

decades.  However, as noted above, plaintiff has slightly shifted his theories of recovery,

raising certain new claims for relief as well as enhancing the allegations of his proposed

pleadings with an affirmation he submitted in opposition to defendants' various arguments.

Where, as here, "a plaintiff seeks to amend his complaint while a motion to dismiss is

pending, a court 'has a variety of ways in which it may deal with the pending motion to

dismiss, from denying the motion as moot to considering the merits of the motion in light of

the amended complaint."  Hamzik v. Officer for People with Dev. Disabilities, 859 F. Supp. 2d

---

[7]  Plaintiff's second proposed amended complaint contains several state law claims.  Those claims
will be addressed in the Conclusion.

265, 273-74 (N.D.N.Y. 2012) (quoting <u>Roller Bearing Co. of Am., Inc. v. Am. Software, Inc.</u>, 570 F. Supp. 2d 376, 384 (D. Conn. 2008)).

The moving defendants have each had an opportunity to respond to the claims raised in Avraham's first proposed amended pleading and, with the exception of the State, each set of defendants has taken advantage of this opportunity by submitting briefing in opposition to plaintiff's motion to amend in addition to fully briefing their respective dismissal motions. Plaintiff, in turn, initially responded to all of these filings by submitting the sixty-five page affirmation mentioned above. In fact, although plaintiff has since submitted a second proposed amended pleading, the allegations of that document are substantially similar to the detailed facts already set forth in his affirmation. Accordingly, because all of the relevant stakeholders have had ample opportunity to respond to the substance of each other's filings, the merits of the pending motions to dismiss will be considered in light of the allegations in both of plaintiff's proposed amended complaints as modified by his supporting affirmation. <u>See, e.g.</u>, <u>Boguslavsky v. Kaplan</u>, 159 F.3d 715, 719 (2d Cir. 1998) ("[C]ourts may look to submissions beyond the complaint to determine what claims are presented by an uncounseled party.").

## A. <u>RICO</u>

Avraham's proposed amended complaint indicates that his civil RICO claims are based on mail and/or wire fraud. <u>See</u> Compl. at 46 (asserting that "[t]he [d]efendants have engaged in the pattern of harassment" through "use of the U.S. Mail . . . [and by] e-mailing fraudulent messages and documents through the internet" in an attempt to acquire plaintiff's Property).

"RICO was enacted to prevent organized crime from infiltrating America's legitimate

business organizations." Elsevier Inc. v. Memon, 97 F. Supp. 3d 21, 29 (E.D.N.Y. 2015) (citation and internal quotation marks omitted). RICO contains a criminal provision, 18 U.S.C. § 1962, and a civil provision, 18 U.S.C. § 1964. As relevant here, RICO's civil provision permits recovery for any person who is "injured in his business or property by reasons of a violation of" RICO's criminal provision. 18 U.S.C. § 1964(c).

To establish a civil RICO claim, "a plaintiff must show: '(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962.'" Elsevier Inc., 97 F. Supp. 3d at 30 (quoting DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001)).

Importantly, a RICO plaintiff must satisfy two, distinct pleading burdens. First, a plaintiff "must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962, commonly known as criminal RICO." Elsevier Inc., 97 F. Supp. 3d at 30 (quoting Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983)).

To satisfy the first burden, the plaintiff must allege the following "seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." Elsevier Inc., 97 F. Supp. 3d at 30.

"To satisfy the second burden, a plaintiff 'must allege that he was 'injured in his business or property by reason of a violation of section 1962.'" Elsevier Inc., 97 F. Supp. 3d at 30. Notably, "[a] plaintiff must adequately allege the[ ] seven [constituent] elements 'before turning to the second burden—i.e., invoking RICO's civil remedies.'" Id.

"Civil RICO claims are subject to a four-year statute of limitations." Nat'l Grp. for

Comm'cns & Computs. Ltd. v. Lucent Techs. Inc., 420 F. Supp. 2d 253, 264 (S.D.N.Y. 2006). "The statute of limitations begins to run 'when the plaintiff discovers or should have discovered the RICO injury.'" Id. (quoting Tho Dinh Tran v. Alphonse Hotel Corp., 281 F.3d 23, 35 (2d Cir. 2002).

"Although RICO cases often involve 'pattern[s] of predicate acts that [are] complex, concealed or fraudulent,' the Supreme Court has clearly held that it is plaintiff's discovery of the injury, not discovery of the underlying pattern of predicate acts, which triggers the statute of limitations." Lucent Techs. Inc., 420 F. Supp. 2d at 264 (quoting Rotella v. Wood, 528 U.S. 549, 555-57 (2000). Further, pursuant to the "separate accrual rule," a RICO plaintiff "who is continuously injured by an underlying RICO violation may only recover for injuries discovered or discoverable within four years of the time suit is brought." Id.

With these standards in mind, any recovery for the vast majority of conduct Avraham describes in his proposed pleadings, as well as in his affirmation, is time-barred by the four-year statute of limitations applicable to civil RICO claims.[8]  However, because plaintiff filed this action on October 30, 2015, any allegations beginning in October of 2011 require further analysis.

For example, Avraham indicates that he received a letter from Hooper on October 3, 2014, presumably connected to his failed attempts to receive certain permits from the Town of Cicero.  Second, plaintiff alleges that the Town of Cicero enacted "Local Law 5" on June 24, 2015, which changed the definition of a "restaurant" and resulted in adverse

---

[8]  "A motion to dismiss is often not the appropriate stage to raise affirmative defenses like the statute of limitations." Ortiz v. City of New York, 755 F. Supp. 2d 399, 401 (E.D.N.Y. 2010).  However, "as long as the affirmative defense is based on the facts allege dint he complaint, it may be raised on a motion to dismiss." Id.  Accordingly, a 12(b)(6) dismissal for untimeliness is warranted where the "complaint shows clearly that a claim is not timely." Id. (citation omitted).

consequences for him.  Third, plaintiff asserts that "during the summer of 2015," defendants Procopio, Hooper, Zambrano, Conway, Marzocchi, and the Germain Firm filed complaints with the Onondaga County Health Department in an attempt to have plaintiff's health permit revoked, threatened his "milling materials supplier" with the loss of certain Town business, used the New York State court system to attempt to dismantle certain "platforms" plaintiff had built, and caused the New York State Liquor Authority to revoke his liquor license.  Fourth, plaintiff asserts he was served by Hooper with a "Notice of Appearance" for "town court" that "alleged 8 code enforcement violations."

With respect to Avraham's allegations concerning notices of code violations, service of legal process, or formal complaints sent to municipal or state agencies, a defendant's "use of mail and wire to conduct allegedly fraudulent 'litigation activities' is insufficient to establish predicate acts of racketeering."  Snyder v. U.S. Equities Corp., 2014 WL 317189, at *7 (W.D.N.Y. Jan. 28, 2014) (collecting cases).

Further, Rule 9(b) requires allegations sounding in fraud, such as those surrounding the acts on which Avraham's proposed RICO claims are based, to be "state[d] with particularity."  FED. R. CIV. P. 9(b).  To comply with this particularity requirement, "the complaint must:  (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Elsevier Inc., 97 F. Supp. 3d at 30 (citation omitted).

After careful review of all of Avraham's submissions, none of the timely allegations, whether considered individually or in the aggregate, are sufficient to meet the relatively demanding threshold pleading requirements for a civil RICO claim set forth above.  Cf. Toms v. Pizzo, 4 F. Supp. 2d 178, 183 (rejecting pro se plaintiff's attempt to "satisfy the RICO

pleading requirements simply by reiterating a laundry list of predicate acts found in the statute or case law"), aff'd 172 F.3d 38 (2d Cir. 1998) (summary order).  Accordingly, plaintiff's RICO claims must be dismissed.

### B. **New York Penal Law**

Avraham's proposed amended complaint also alleges defendants have "engaged in hate crimes" in violation of New York Penal Law.  Compl. at 52-53.  However, a "plaintiff has no private right of action to enforce state criminal statutes and lacks the authority to institute a criminal investigation." Sulehria v. New York, 2012 WL 1288760, at *11 (N.D.N.Y. Feb. 8, 2012) (Baxter, M.J.) (Report & Recommendation) (collecting cases), adopted by 2012 WL 1284380 (N.D.N.Y. Apr. 16, 2012) (Kahn, J.).  Accordingly, plaintiff's claims based on New York Penal Law must be dismissed.

### C. <u>42 U.S.C. § 1981</u>

Avraham also alleges that defendants unlawfully interfered with his right to contract when Hooper and others directed plaintiff's "milling supplier" to stop dumping millings on plaintiff's Property.  Compl. at 49-51.  According to plaintiff, the Club "was receiving the same millings and having them dumped into its parking lot" and that this differential treatment was therefore "done because [p]laintiff is a Jew, color, national origin, hatefully motivated." Id. Plaintiff suggests this occurred "during the summer of 2015." Id.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  "To make and enforce contracts" includes the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  CBOCS West, Inc. v.

<u>Humphries</u>, 553 U.S. 442, 450 (2008).

"To state a claim under § 1981, a plaintiff must allege: '(1) [that he] is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute." <u>Andrews v. Fremantlemedia, N.A., Inc.</u>, 613 F. App'x 67, 69 (2d Cir. 2015) (summary order) (quoting <u>Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.</u>, 7 F.3d 1085, 1087 (2d Cir. 1993)).

"The statute of limitations for claims brought pursuant to 42 U.S.C. § 1981 is [ ] three years unless the claims arise out of a post-1990 Act of Congress such as the 1991 Amendments to § 1981 (pertaining to discrimination in contractual relationships), in which case the statute of limitations is four years." <u>Morales v. Cnty. of Suffolk</u>, 952 F. Supp. 2d 433, 436 (E.D.N.Y. 2013).

"In order to survive a motion to dismiss, a plaintiff must specifically allege the 'circumstances giving rise to a plausible inference of racially discriminatory intent." <u>Morales</u>, 952 F. Supp. 2d at 436 (quoting <u>Yusuf v. Vassar Coll.</u>, 35 F.3d 709, 713 (2d Cir. 1994). Importantly, "liability under § 1981 for interference with a third-party contract attaches only to persons who actually had the power or authority to prevent the plaintiffs from contracting with the third party." <u>Ginx, Inc. v. Soho Alliance</u>, 720 F. Supp. 2d 342, 358 (S.D.N.Y. 2010).

Avraham alleges that Hooper told plaintiff's "milling materials supplier" to "stop delivering millings." Compl. at 50. Plaintiff also alleges that the municipal defendants—six in total—threatened plaintiff's materials supplier with "losing the municipal road project" if he did not discontinue deliveries. <u>Id</u>. But beyond the conclusory allegation that this was done because [p]laintiff is a Jew, color, national origin, hatefully motivated," there is nothing to

connect this adverse action to plaintiff's ethnicity.  See, e.g., Dickerson v. State Farm Fire & Cas. Co., 1996 WL 334076, at *3 (S.D.N.Y. Aug. 1, 1996) ("It is not enough merely to assert that the defendant took adverse action against the plaintiff, and that the action was the product of racial animus.  The complaint must allege specific facts supporting both the existence of the racial animus and the interference of a link between the adverse treatment and the racial animus.").

Hooper and the other municipal defendants who might actually have been empowered to interfere with Avraham's milling supplier are not the defendants responsible for the racial and ethnic slurs that were directed toward plaintiff in the late 1990s or early 2000s.  These instances of racial or ethnic animus, which occurred over a period of almost twenty years and are attributed to various identified and unidentified Club members, are not sufficiently connected to these municipal defendants to give rise to a plausible inference of animus.  Accordingly, plaintiff's § 1981 claims will be dismissed.

### D. **42 U.S.C. § 1983**

Avraham also alleges claims brought pursuant to 42 U.S.C. § 1983 based on the Equal Protection and Due Process clauses of the Fourteenth Amendment.

"The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  Wyatt v. Cole, 504 U.S. 158, 161 (1992).  However, "[s]ection 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993).  Accordingly, to prevail on a § 1983 claim, a plaintiff must show (1) the deprivation of a right, privilege, or immunity secured by the Constitution and its laws by (2) a person acting

under the color of state law.  <u>See</u> 42 U.S.C. § 1983.

"In § 1983 actions, the applicable limitations period is the 'general or residual state statute of limitations.'"  <u>Fierro v. N.Y.C. Dep't of Educ.</u>, 994 F. Supp. 2d 581, 85-86 (S.D.N.Y. 2014) (quoting <u>Pearl v. City of Long Beach</u>, 296 F.3d 76, 79 (2d Cir. 2002)).  "For a § 1983 claim arising in New York, the statute of limitations is three years." <u>Id.</u> (citations omitted). "Federal law, however, determines when a § 1983 cause of action accrues." <u>Id.</u> (citation omitted).  "[A]ccrual occurs 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.'" <u>Id.</u> (quoting <u>Pearl</u>, 296 F.3d at 80).

### 1. <u>Equal Protection</u>

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  "The Equal Protection Clause requires that the government treat all similarly situated people alike." <u>Gentile v. Nulty</u>, 769 F. Supp. 2d 573, 577-78 (S.D.N.Y. 2011).

An Equal Protection claim may be brought by a "class of one" in cases "where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." <u>Id.</u> at 578 (quoting <u>Analytical Diagnostic Labs, Inc. v. Kusel</u>, 626 F.3d 135, 140 (2d Cir. 2010)).  Alternatively, a plaintiff may prevail on a theory of "selective enforcement" by showing "(1) that he was treated differently from others similarly situated, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." <u>Id.</u> (citation and internal quotation marks omitted).

The statute of limitations applicable to Avraham's § 1983 claims operates to bar consideration of any unlawful events that might have occurred before October of 2012. The remaining timely allegations are primarily based on the allegedly unfair denial of a requested building permit as well as the Town of Cicero's enactment of "Local Law 5" on June 24, 2015. According to plaintiff, this local law has been "arbitrarily enforced" against him and is part of a larger effort to prevent him from "developing his real property and to reduce the value of the property to very little worth."

These assertions are insufficient to state a plausible equal protection claim under either a class-of-one or selective enforcement theory. "Courts, including the Second Circuit, have repeatedly cautioned about the danger of ordinary disputes between a citizen and a municipality—whether it be about land use, licenses, inspections, or some other regulatory or investigative function of local governments—being transformed into federal lawsuits" through an overly expansive reading of the equal protection clause. Crippen v. Town of Hempstead, 2013 WL 1283402, at *7 (E.D.N.Y. Mar. 29, 2013).

Although Avraham asserts that Hooper and other Town officials falsely promised plaintiff that he would be granted a building permit if he applied for it, he has failed to demonstrate how such falsehoods violated his constitutional rights. With respect to Local Law 5, plaintiff has done little more than assert that it has been applied to him unfairly. Absent additional details, this sort of conclusory assertion runs afoul of basic pleading requirements and fails to state a plausible equal protection claim. See, e.g., MacPherson v. Town of Southampton, 738 F. Supp. 2d 353, 371 (E.D.N.Y. 2010) (dismissing equal protection claim, whether pleaded as "selective enforcement" or "class-of-one" claim, because complaint failed to "identify any comparators or similarly situated entities").

Avraham further asserts that "during the summer of 2015," defendants Procopio, Hooper, Zambrano, Conway, Marzocchi, and the Germain Firm filed complaints with the Onondaga County Health Department in an attempt to have plaintiff's health permit revoked, threatened his "milling materials supplier" with the loss of certain Town business, used the New York State court system to attempt to dismantle certain "platforms" plaintiff had built, and caused the New York State Liquor Authority to revoke his liquor license.

Even accounting for Avraham's pro se status, these assertions also fail to satisfy threshold pleading requirements. Among other things, plaintiff has failed to identify which conduct is attributable to one or more of the six different defendants named in this portion of his proposed pleading or how one or more of these defendants have singled plaintiff out for this treatment without a rational basis on which to do so. Accordingly, plaintiff's equal protection claims will be dismissed.

### 2. Due Process

The Due Process Clause of the Fourteenth Amendment to the Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Due process has both a procedural and substantive component." Berrios v. State Univ. of N.Y. at Stony Brook, 518 F. Supp. 2d 409, 418 (E.D.N.Y. 2007). "Procedural due process requirements are generally satisfied by appropriate notice and an opportunity to be heard." Id. "Substantive due process, on the other hand, refers not to particular hearing procedures, but circumscribes an 'outer limit' on permissible governmental action." Id.

A procedural due process claim generally requires a plaintiff to satisfy three elements: "*first*, identify a property right, *second* show that the government has deprived him

of that right, and *third* show that the deprivation was effected without due process." Ahmed v. Town of Oyster Bay, 7 F. Supp. 3d 245, 254 (E.D.N.Y. 2014) (emphasis in original).

Like his § 1983 equal protection claims, Avraham's assertions detailing conduct that occurred before October 2012 are time-barred by the applicable statute of limitations. See generally Compl. at 39-46. The timely allegations that remain fail to include information about certain necessary predicates to a due process claim. For example, the proposed pleadings fail to explain the particular building permits he sought, the reasons why plaintiff was entitled to receive those particular permits, or how the Town of Cicero officials deprived him of the appropriate process associated with those permit requests. See Kabrovski v. City of Rochester, N.Y., 149 F. Supp. 3d 413, 421 (W.D.N.Y. 2015) (noting that a procedural or substantive due process claim lies only where a plaintiff has a protected property interest in receiving the permit; i.e., if "the issuing authority lacks discretion to deny the permit . . . or if the discretion of the issuing agency was so narrowly circumscribed that approval of a proper application was virtually assured").

If anything, a review of the proposed pleadings indicate that the Town of Cicero's Code Enforcement Office employees and other Town officials regularly engaged with Avraham, recorded his various requests, and permitted him to participate in some kind of an application process that ultimately resulted in various denials. Without more, "[t]he fact that the permit could have been denied on non-arbitrary grounds defeats the federal due process claim." RRI Realty Corp. v. Inc. Vill. of Southampton, 870 F.2d 911, 918 (2d Cir. 1989). Accordingly, plaintiff's due process claims must be dismissed.

### 3. Conspiracy

Although Avraham repeatedly invokes RICO to claim the existence of a conspiracy, it

also bears noting that both § 1983 and § 1985 permit recovery where defendants have conspired to violate a plaintiff's constitutional rights.

To state a § 1985 conspiracy claim, "a plaintiff mus[t] allege:  (1) some class-based discriminatory animus underlying the defendant's actions; and (2) that the conspiracy was aimed at interfering with plaintiff's protected rights."  Trombley v. O'Neill, 929 F. Supp. 2d 81, 96 (N.D.N.Y. 2013) (Suddaby, J.).  To state a § 1983 conspiracy claim, a plaintiff must allege: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  Id. at 97 (citations and internal quotation marks omitted).

Importantly, however, "[a] violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right.  Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights."  Trombley, 929 F. Supp. 2d at 97 (citation omitted).  Further, "[v]ague and conclusory allegations that defendants entered into an unlawful agreement will not suffice to state a conspiracy claim under either § 1983 or § 1985(3)."  Id.  Instead, "a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end."  Id. (citation omitted).

As discussed above, Avraham has failed to establish any plausible claims for the denial of a constitutional right.  Further, his permit-related claims focus on allegedly improper conduct by Town of Cicero officials and are not sufficiently connected to any alleged agreement to act in concert with LYCC members.  Trombly, 929 F. Supp. 2d at 106 ("[O]fficers, agents, and employees of a single municipal entity, each acting within the scope

of his or her employment, are legally incapable of conspiring with each other."). Accordingly, any claim based on a conspiracy to violate plaintiff's constitutional rights must also be dismissed.

### E. Final Matters

As noted above, the State has not filed any supplemental opposition to Avraham's motion to amend, presumably relying on its prior filing seeking Rule 12(b)(1) dismissal on the basis of the Eleventh Amendment immunity. A review of the proposed amended complaints and plaintiff's affirmation reveal that his allegations focus on actions by Club members and officials with the Town of Cicero. These pleadings do not describe how the State itself was even involved in the alleged conduct, let alone how it might be liable for it. Accordingly, the State's motion to dismiss will be granted.

In a similar vein, the Hancock Firm Defendants correctly note that Avraham's amended pleadings largely omit any substantive allegations against them outside of a passing reference to a consultation. See Abreu v. Travers, 2016 WL 6127510, at *16 (N.D.N.Y. Oct. 20, 2016) (D'Agostino, J.) ("Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff."). Accordingly, the Hancock Firm Defendants' motion to dismiss will also be granted.

Likewise, although the Surveying Firm Defendants did not oppose Avraham's first motion to amend, it bears noting that the proposed pleadings are bereft of any substantive allegations concerning them. "When a complaint names defendants in the caption but makes no substantive allegations against them in the body of the pleading, the complaint does not state a claim against these defendants." Ho Myung Moolsan Co., Ltd. v. Manitou

Mineral Water, Inc., 665 F. Supp. 2d 239, 251 (S.D.N.Y. 2009).  Accordingly, the Surveying

Firm Defendants will also be dismissed from this action.  Cohen v. Local 338-

RWDSU/UFCW, 2010 WL 3199695, at *11 (S.D.N.Y. Aug. 12, 2010) (dismissing claims

against certain defendants sua sponte where the amended pleading "contain[ed] no factual

allegations" against those defendants and lacked any suggestion that they "engaged in any

conduct that would entitle plaintiff to relief").

        Finally, although district courts in this Circuit are generally reluctant to dismiss a pro se

plaintiff's action without permitting leave to replead, the Second Circuit has explained that it is

nevertheless appropriate to do so in cases "[w]here it appears that granting leave to amend

is unlikely to be productive."  Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir.

1993).  In this case, Avraham has already had four opportunities to plead a plausible claim

based on the underlying factual narrative set forth in his filings—first, in his initial complaint;

later, in his proposed amended pleading, itself submitted in an effort to cure deficiencies

identified by defendants in their initial series of dismissal arguments; more recently, in the

sixty-five page affirmation that was accepted in reply to defendants' renewed dismissal

arguments; and finally, in his recently filed second proposed amended complaint.  Because

none of these filings suffice to state a claim, permitting another opportunity to amend at this

point is "unlikely to be productive."  Accordingly, leave to replead will not be granted.

## V.  **CONCLUSION**

        Without being unsympathetic to Avraham's ongoing frustration, neither the allegations

in his proposed amended complaint nor the substantially similar allegations set forth in his

proposed second amended complaint, even amplified by the additional factual details set

forth in his affirmation, are sufficient to state viable federal claims.  Because a federal court is

a court of limited jurisdiction and typically only presides over a certain limited class of cases, it bears noting that the remedy for defendants' allegedly wrongful conduct in connection with plaintiff's more recent requests for certain permits likely lies in state court. See, e.g., Christian v. Town of Riga, 649 F. Supp. 2d 84, 96 (W.D.N.Y. 2009) (noting that "New York State law provides mechanisms for relief from a denial of or delay in issuing a building permit" and citing New York's Civil Practice Law and Rules Article 78). Finally, to the extent that plaintiff's newly proposed pleading might be construed to assert claims based on state law, supplemental jurisdiction over those claims is declined. See 28 U.S.C. § 1367(c)(3).

Therefore, it is

ORDERED that

1. Avraham's first motion to amend his complaint (ECF No. 49) is DENIED as futile;

2. Avraham's second motion to amend his complaint (ECF Nos. 62, 64) is DENIED as futile;

3. Avraham's motion for a default judgment as to LYCC (ECF No. 38) is DENIED as moot;

4. Permission to file a further motion to amend the complaint is NOT GRANTED;

5. New York State's motion to dismiss (ECF No. 25) is GRANTED;

6. The Gilberti Firm's motion to dismiss (ECF No. 27) is GRANTED;

7. The Town Defendants' motion to dismiss (ECF No. 29) is GRANTED;

8. The Hancock Firm Defendants' motion to dismiss (ECF No. 30) is GRANTED;

9. The Germain Firm's motion to dismiss (ECF No. 37) is GRANTED;

10. The Club's motion to dismiss (ECF No. 46) is GRANTED;

11. Avraham's claims based on federal law are DISMISSED with prejudice as to all

defendants; and

12. Jurisdiction over Avraham's state law claims is DECLINED and those claims are

DISMISSED without prejudice.

The Clerk of the Court is directed to enter a judgment accordingly and close the file.

IT IS SO ORDERED.


Dated: November 7, 2016
          Utica, New York.

United States District Judge